**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JACKIE L. HIGH,                                            No. C-11-5478 EMC

        Plaintiffs,

    v.                                                **ORDER GRANTING DEFENDANTS'
                                                         MOTIONS TO DISMISS**

THE CHOICE MANUFACTURING                          **(Docket Nos. 65, 67)**
COMPANY, *et al.*,

        Defendants.

_____/

      Plaintiffs Jackie L. High, Travis Peavy, and Loretta Alva have filed a class action against the

following entities and persons: Choice Manufacturing Co., Inc.; Independent Bank Corporation;

MEPCO Finance Corporation; Peter Masi; Darain Atkinson; and Cory Atkinson.  Currently pending

before the Court is (1) Mr. Masi's motion to dismiss for lack of personal jurisdiction and for failure

to state a claim for relief and (2) MEPCO and IBC's motion to dismiss for failure to state a claim for

relief.  Having considered the parties' briefs and accompanying submissions, as well as the oral

argument of counsel, the Court hereby **GRANTS** both motions.  The dismissal as to Mr. Masi is

without prejudice.  As for MEPCO and IBC, some of the claims are dismissed without prejudice;

others are dismissed with prejudice.

## I.    FACTUAL & PROCEDURAL BACKGROUND

      In their second amended complaint ("SAC"), Plaintiffs allege as follows.

      A vehicle service contract ("VSC") is essentially an insurance-like agreement in which a

consumer pays a certain amount of money in exchange for a promise that the cost of repairing his or

United States District Court

For the Northern District of California

1  her vehicle will not have to be paid by him or her but rather will be borne by another person or

2  entity.  *See* SAC ¶ 2.  A VSC generally involves the following parties:

3  (1)    the consumer who purchases the VSC;

4  (2)    the seller who sells the VSC to the consumer;

5  (3)    the administrator who decides whether to approve or deny a claim for repairs made by a

6         consumer pursuant to the VSC; and

7  (4)    the insurer who guarantees payment of covered claims if the administrator cannot or does

8         not.

9  *See* SAC ¶ 4.  Because the cost of a VSC is not insignificant – *e.g.*, $2,000 to $4,000[1] – a consumer

10 is usually given the opportunity to pay for the VSC through a payment plan.  As a result, there is

11 usually a fifth party involved in a VSC transaction, namely, a financing company that pays the seller

12 and administrator upfront for the VSC and then collects monthly payments from the consumer.  *See*

13 SAC ¶ 4.

14         In the instant case, the relevant players were:

| Consumer | Each plaintiff and/or putative class member |
|---|---|
| Seller | NAWUS (also known as NAWS and U.S. Fidelity) |
| Administrator | Choice (a corporation which is solely owned by Mr. Masi and for which he serves as president) |
| Financing Company | MEPCO (which has IBC as its parent) |

21 Apparently, there was no insurer because Choice failed to maintain insurance.  *See* SAC ¶¶ 6, 54.

22         Plaintiffs each purchased a VSC from NAWUS.  *See* SAC ¶¶ 30, 108-27.  Essentially, each

23 person was told that, if he or she purchased a VSC, the any cost of repairing his or her car would be

24 covered.  This was not, in fact, true.  Coverage was limited in significant ways.  For example, there

---

[1]  *See* SAC ¶ 150.

**United States District Court**
For the Northern District of California

were limitations on reimbursement, exclusions on the types of repairs covered, and so forth.[2]  *See, e.g.*, SAC ¶¶ 44, 149(b).  Moreover, Choice ended up routinely and unreasonably denying claims for repairs, including Plaintiffs'.  *See* SAC ¶¶ 114, 122, 127, 154.  According to Plaintiffs, Choice never maintained insurance and routinely and unreasonably denied claims for repairs because the VSC scheme was set up simply to defraud consumers; there was never any intent to pay for repairs.  *See, e.g.*, SAC ¶¶ 54, 68.  Plaintiffs indicate that all of the defendants, not just Choice, were a part of this scheme.

Because of the cost of a VSC, each plaintiff entered into a Payment Plan Agreement ("PPA") with Choice under which he or she could make monthly payments to pay off the cost of the VSC.  *See* SAC ¶ 36.  Plaintiffs contend that MEPCO was also a party to the PPA, but, as MEPCO points out in its motion to dismiss, the PPA on its face says that it is an agreement between the consumer and Choice.  *See* SAC, Ex. B (PPA) (providing that "[t]his Payment Plan Agreement . . . is by and between Purchaser (as shown above) and the Administrator of the vehicle service contract listed above").  MEPCO is identified on the PPA as the payment plan servicer only.  *See* SAC, Ex. B (PPA).  Ultimately, the total paid for the VSC was to be divided as follows: (1) 60% to NAWUS (the "Dealer Profit"); (2) 30% to Choice (the "Dealer Cost"); and (3) 10% to MEPCO (the "Discount Rate").  *See* SAC ¶ 150.  However, it appears that MEPCO did not split up each monthly payment made by a consumer according to these percentages.  Rather, what MEPCO would do is advance *all* of NAWUS and Choice's cut once the consumer made the *first* monthly payment.  *See* SAC ¶ 37.  Then, if there was a cancellation of the VSC by the consumer, MEPCO would have to get back any "unearned" money from NAWUS and Choice.

Plaintiffs allege that a number of consumers ended up canceling their VSCs – largely because of Choice's unreasonable denial of claims for repairs.  The only way that NAWUS could pay MEPCO back for the cancellations was through new VSC sales for which it would obtain funding from MEPCO.  Essentially, this was a Ponzi-like set-up.  *See* SAC ¶ 91.  Plaintiffs maintain

---

[2]  Plaintiffs also assert that other misrepresentations were made to consumers to convince them to purchase VSCs – *e.g.*, mailings were sent out falsely implying that NAWUS was affiliated with a car manufacturer and/or falsely suggesting that a consumer's existing automobile warranty was due to expire.  *See* SAC ¶ 149(c).

United States District Court
For the Northern District of California

that MEPCO was aware of NAWUS's practice, *see, e.g.*, SAC ¶¶ 88-89, but did not care so long as there were new sales in the pipeline. *See* SAC ¶ 92. Plaintiffs emphasize that NAWUS sales of VSCs made up a substantial portion of MEPCO's business – more than one-half. *See* SAC ¶ 70 (alleging that, "[b]y the end of 2009, MEPCO had a total of $406.3 million of payment plan receivables on its books, of which $206.1 million was attributable to NAWUS, i.e., over one-half of MEPCO's entire business). In turn, NAWUS completely depended on MEPCO in order to maintain its business because the vast majority of the VSCs it sold were funded by MEPCO. *See* SAC ¶ 71 (alleging that MEPCO was the financing organization on 92.5% of NAWUS's sales).

Eventually, MEPCO stopped funding NAWUS because VSC sales had fallen so low that it no longer made sense for MEPCO to fund new deals. *See* SAC ¶ 76. Once MEPCO stopped the funding, NAWUS stopped selling new VSC products. *See* SAC ¶ 76. Eventually, NAWUS went into bankruptcy in March 2010. *See* SAC ¶ 106.

As alleged in the SAC, the primary wrongdoers in the fraudulent VSC scheme were NAWUS, who made the misrepresentations to induce consumers to buy the VSCs, and Choice, who routinely and unreasonably denied claims for repairs. Plaintiffs maintain, however, that MEPCO also engaged in wrongdoing because it knew or should have known that the VSCs sales were deceptive but kept on doing business with NAWUS and Choice. According to Plaintiffs, MEPCO knew or should have known that the VSC sales were deceptive because it knew, *e.g.*, that (1) multiple state attorney general lawsuits or investigations had been launched against NAWUS[3]; (2) numerous consumer complaints had been made against NAWUS; (3) there were high cancellation rates for the VSCs; and (4) NAWUS did not have adequate reserves to pay for cancellations (such that, *e.g.*, it had to ask for mid-week fundings from MEPCO multiple times). *See, e.g.*, SAC ¶¶ 83-84, 90, 99, 166.

Based on, *inter alia*, the following allegations, Plaintiffs have asserted multiple claims for relief, both federal and state. As to MEPCO, its parent IBC, and Mr. Masi (the sole shareholder and

---

[3] It is not entirely clear from the SAC what the state attorneys general were suing about or investigating. Plaintiffs allege that deceptive marketing was at issue, *see* SAC ¶ 166, but that could simply be, *e.g.*, illegal telemarketing through the use of robo-calls.

president of Choice) – *i.e.*, the parties who have currently filed motions to dismiss – the following claims have been asserted:

| | MEPCO | IBC | Mr. Masi |
|---|---|---|---|
| Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") | X | X | X |
| Violation of California Business & Professions Code § 17200 | X | X | X |
| Violation of California Business & Professions Code § 17500 | X | X | X |
| Violation of the California Consumer Legal Remedies Act ("CLRA") | X | | |
| Breach of Contract | X | | |
| Breach of the Implied Covenant of Good Faith and Fair Dealing | X | X | X |
| Fraud | X | X | X |
| Violation of the Magnuson-Moss Warranty Act | | | X |
| Unjust enrichment/quasi-contract | X | X | X |
| Breach of express warranty/service contract | | | X |

Currently pending before the Court are (1) Mr. Masi's motion to dismiss for lack of personal jurisdiction and failure to state a claim for relief and (2) MEPCO and IBC's motion to dismiss for failure to state a claim for relief. The Court addresses Mr. Masi's motion first and then MEPCO/IBC's.

**United States District Court**

For the Northern District of California

## II.    MR. MASI'S MOTION TO DISMISS

In his motion to dismiss, Mr. Masi argues that Plaintiffs have failed to establish that there is personal jurisdiction over him in this state.  Mr. Masi further argues that, even if there were personal jurisdiction, Plaintiffs have failed to state a claim for relief against him.

A.    Lack of Personal Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss an action for lack of personal jurisdiction.  *See* Fed. R. Civ. P. 12(b)(2).  Where a court does not hold an evidentiary hearing to determine the matter of personal jurisdiction and looks solely to written materials submitted by the parties, a plaintiff need not establish personal jurisdiction by a preponderance of the evidence.  Rather, the plaintiff must show only a prima facie case of personal jurisdiction to withstand the motion to dismiss.  *See Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).  To make out a prima facie case, "[t]he plaintiff cannot 'simply rest on the bare allegations of its complaint,' but uncontroverted allegations in the complaint must be taken as true."  *Id.*  Furthermore, while a court "'may not assume the truth of allegations in a pleading which are contradicted by affidavit,' . . . factual disputes [are resolved] in the plaintiff's favor."  *Id.*; *see also Fiore v. Walden*, 657 F.3d 838, 846-47 (9th Cir. 2011) (noting the same).

In the instant case, Plaintiffs argue that there is personal jurisdiction over Mr. Masi because (1) RICO has a special personal jurisdiction provision, *see* 18 U.S.C. § 1965(b), and (2) Choice did not make a personal jurisdiction challenge and the company is Mr. Masi's alter ego.  Ultimately, both of these arguments turn on whether there is a prima facie showing that Choice is Mr. Masi's alter ego.  This is because the Court cannot exercise personal jurisdiction pursuant to RICO unless Plaintiffs first allege a viable RICO claim, *see Just Film, Inc. v. Merch. Servs.*, No. C 10-1993 CW, 2010 U.S. Dist. LEXIS 130230, at *17 (N.D. Cal. Nov. 29, 2010) (noting that "Plaintiffs do not allege sufficient facts to support their RICO claims" and that, "[u]ntil and unless they state RICO claims, the Court cannot exercise personal jurisdiction under § 1965(b) over the individual Leasing Defendants"), and Plaintiffs' RICO claim against Mr. Masi is predicated on Choice being his alter ego.  The Court therefore focuses on whether Plaintiffs have made a prima facie case that Choice is Mr. Masi's alter ego.

**United States District Court**
For the Northern District of California

As a preliminary matter, the Court takes note that nonconclusory allegations of alter ego are all but lacking in the complaint. There are allegations suggesting that the various companies purportedly controlled by Mr. Masi (*e.g.*, Choice and Independent Dealer Group) are alter egos of one another, *see, e.g.*, SAC ¶¶ 51-53, but that is not the same thing as saying that Choice is Mr. Masi's alter ego. The only real allegation on alter ego is that Mr. Masi is the sole shareholder and president of Choice but that fact by itself is not enough to give rise to a prima facie case of alter ego, whether under state or federal law.[4] *See Leek v. Cooper*, 194 Cal. App. 4th 399 , 415 (2001) (stating that "[a]n allegation that a person owns all of the corporate stock and makes all of the management decisions is insufficient to cause the court to disregard the corporate entity"); *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838-39 (1962) (noting that courts have considered "a variety of factors" based on "the particular circumstances of each case" to make a decision on alter ego liability; listing as *one* such factor "sole ownership of all of the stock in a corporation by one individual or the members of a family"); *Katzir's Floor & Home Design, Inc. v. M-MLS.COM*, 394 F.3d 1143, 1149 (9th Cir. 2004) (stating that "[t]he mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law").

As for the evidence of alter ego on which Plaintiffs rely, it is not especially compelling. For example:

• In the case at bar, Mr. Masi submitted a declaration in which he stated that Choice was consenting to the withdrawal of its attorneys. He also made two appearances before the Court in conjunction with a motion to withdraw as counsel filed by Choice's attorney's. *See* Opp'n at 11. The problem for Plaintiffs is that these acts are not inconsistent with Mr. Masi's role as president of Choice. It does not establish that the corporate separateness of Choice was not maintained.

---

[4] Note that the parties have not really provided substantive briefing on whether federal or state law on alter ego liability should apply. *See Wolfe v. United States*, 798 F.2d 1241, 1244 n.3 (9th Cir. 1986) (stating that "[t]he determination of whether to apply state or federal alter ego doctrine depends on the degree to which the subject matter of the case implicates federal interests"). Plaintiffs assert that state law is applicable. *See* Opp'n at 9.

United States District Court

For the Northern District of California

- During one of the hearings on the motion to withdraw, Mr. Masi made the following statements: (1) "[W]e're broke.  We don't have money to be able to pay the attorneys.  And we're doing everything we can, but, you know, we are effectively out of money and we can't pay.  *I* can't pay.  *I* can't pay the attorneys to represent us"; and (2) "We're trying not to file for bankruptcy. . . . [I]f we can settle something on a case-by-case basis we would like to be able to do that.  You know, we're trying to manage the situation as best we can.  And bankruptcy is not something *I* really want to do.  [¶] However, if *I'm* forced into that, it would be really undesirable. . . . [¶] If we were forced into that I guess that's where we would end up . . . ."  Mehdi Decl., Ex. J (Tr. at 3-4) (emphasis added).  This evidence is stronger than the evidence discussed above.  If, for example, Mr. Masi were himself paying Choice's bills, that might suggest that funds were being commingled.  But the language above is equivocal – Mr. Masi switches between the use of "we" and "I."  While the language suggests Mr. Masi identifies himself with Choice, that is not surprising since he is Choice's president.  His statements do not form a sufficient basis to infer, *e.g.*, commingling of funds.

- Other entities affiliated with Mr. Masi appear to be doing business still but Choice is essentially no longer doing business.  According to Plaintiffs, this suggests that Choice is being undercapitalized by design.  *See* Opp'n at 13.  The problem here is that undercapitalization is often a factor considered for purposes of alter ego liability because, where the company is undercapitalized, this suggests that the company was never set up to do business in the first place.  Here, Plaintiffs do allege that Choice never intended to do any actual business; however, they do not claim that there was undercapitalization at the outset but rather only after NAWUS went into bankruptcy and the Atkinson brothers pled guilty.  *See* Opp'n at 13.  Plaintiffs fail to present specific facts from what a plausible inference of undercapitalization may be drawn.

The Court finds that Plaintiffs' allegations in the complaint and evidence submitted in conjunction with this motion are insufficient to establish a prima facie case of alter ego liability.  Accordingly, the Court grants Mr. Masi's motion to dismiss for lack of personal jurisdiction.  As

**United States District Court**

For the Northern District of California

1   discussed below, the Court also finds dismissal appropriate pursuant to Federal Rule of Civil

2   Procedure 12(b)(6).

3   B.      <u>Failure to State a Claim for Relief</u>

4           Under Rule 12(b)(6), a party may move to dismiss based on the failure to state a claim upon

5   which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A motion to dismiss based on Rule

6   12(b)(6) challenges the legal sufficiency of the claims alleged.  *See Parks Sch. of Bus. v. Symington*,

7   51 F.3d 1480, 1484 (9th Cir. 1995).  In considering such a motion, a court must take all allegations

8   of material fact as true and construe them in the light most favorable to the nonmoving party,

9   although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule

10  12(b)(6) dismissal."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  While "a complaint

11  need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief

12  that is plausible on its face.'"  *Id.*  "A claim has facial plausibility when the plaintiff pleads factual

13  content that allows the court to draw the reasonable inference that the defendant is liable for the

14  misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Bell Atl. Corp. v.*

15  *Twombly*, 550 U.S. 544, 556 (2007).  "The plausibility standard is not akin to a 'probability

16  requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully."  *Iqbal*,

17  129 S. Ct. at 1949.

18          In the instant case, all of the claims asserted against Mr. Masi (*i.e.*, the fraud-related claims

19  including the RICO claim; the contract-related claims; and the claim for unjust enrichment) are

20  predicated on Choice being Mr. Masi's alter ego.  For the reasons stated above, Plaintiffs have not

21  alleged enough in their complaint to establish a basis for alter ego liability.  The mere fact that Mr.

22  Masi is the president and sole shareholder of the company is in and of itself not enough to show that

23  the corporate separateness was not appropriately preserved.

24          To the extent Plaintiffs are arguing fraud by Mr. Masi independent of an alter ego theory,

25  they run into another problem:

26                  Rule 9(b) does not allow a complaint to merely lump multiple
                    defendants together but "require[s] plaintiffs to differentiate their
27                  allegations when suing more than one defendant . . . and inform each
                    defendant separately of the allegations surrounding his alleged
28                  participation in the fraud."  In the context of a fraud suit involving

United States District Court

For the Northern District of California

1    multiple defendants, a plaintiff must, at a minimum, "identif[y] the
2    role of [each] defendant[] in the alleged fraudulent scheme."

3    *Swartz v. KPMG LLP*, 476 F.3d 756, 764-75 (9th Cir. 2007).  In the instant case, Plaintiffs have

4    essentially lumped Mr. Masi together along with the other defendants.  *See, e.g.*, SAC ¶ 170 *et seq.*

5    (alleging that, "under the direction of MEPCO, IBC, the Atkinson Brothers, Choice and Masi,

6    defendants have committed wire [and mail] fraud").  They have not specified what exactly Mr.

7    Masi's role in the fraudulent scheme was.

8         The Court therefore finds that dismissal under Rule 12(b)(6) is also appropriate.

9    C.   <u>Summary</u>

10        For the foregoing reasons, the Court grants Mr. Masi's motion to dismiss, both as to lack of

11   personal jurisdiction and failure to state a claim for relief.  The dismissal shall be without prejudice.

12   Plaintiffs shall be permitted to explore in discovery with Choice, another named defendant, the

13   relationship between Choice and Mr. Masi.  If such discovery bears fruit, *i.e.*, suggests that Choice is

14   in fact Mr. Masi's alter ego, Plaintiffs may ask to take jurisdictional discovery with respect to Mr.

15   Masi directly or seek leave to amend to add Mr. Masi back to the case.

16                    **III.   MEPCO/IBC'S MOTION TO DISMISS**

17        Like Mr. Masi, MEPCO and IBC have also moved to dismiss pursuant to Rule 12(b)(6).  The

18   legal standard identified in Part III.B is applicable here as well.  The Court addresses first the claims

19   against IBC and then turns to the claims against MEPCO.

20   A.   <u>Claims Against IBC</u>

21        As noted above, IBC is the parent company of MEPCO.  Most (but not all) of the claims

22   asserted against MEPCO have also been asserted against IBC.  In the motion to dismiss, IBC argues

23   that the claims asserted against it should be dismissed because the SAC does not plead any

24   wrongdoing by IBC specifically such that its liability is premised solely on the fact that it is

25   MEPCO's parent.  *See* Mot. at 22.

26        In response, Plaintiffs argue that IBC was directly involved in the wrongdoing because its

27   Executive Vice President and CFO, Robert Shuster, was involved in making decisions regarding

28   NAWUS.  *See* Opp'n at 11-12.  The problem with Plaintiffs' position is that Mr. Shuster was also

United States District Court

For the Northern District of California

1    MEPCO's president.  *See* SAC ¶ 28.  Thus, plausibly, Mr. Shuster was acting in his capacity as a

2    MEPCO official (and not an IBC official) when dealing with NAWUS.  Although Plaintiffs allege in

3    their SAC that Mr. Shuster was acting in his capacity as an IBC official, they have not pled any

4    specific facts to support that allegation as required by *Twombly* and *Iqbal*.

5         Accordingly, the Court dismisses the claims against IBC.  The Court shall allow Plaintiffs to

6    file amended claims against IBC only to the extent the claims against MEPCO may be amended, as

7    discussed below.

8    B.   <u>Claims Against MEPCO</u>

9         MEPCO has moved for a dismissal of each of the claims asserted against it, arguing, *inter*

10   *alia*, that Plaintiffs have failed to allege that MEPCO made any misrepresentation to Plaintiffs, that

11   Plaintiffs relied on the misrepresentation, and that MEPCO breached a contractual obligation to

12   Plaintiffs.

13        1.   <u>RICO</u>

14        In their SAC, Plaintiffs assert a violation of RICO, more specifically, 18 U.S.C. § 1962(c),

15   which provides in relevant part that "[i]t shall be unlawful for any person . . . associated with any

16   enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

17   participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

18   racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  According to Plaintiffs,

19   the enterprise that MEPCO is associated with is NAWUS, and MEPCO participated in the conduct

20   of NAWUS's affairs through a pattern of mail and wire fraud.  *See* SAC ¶¶ 144-45.

21        MEPCO argues that Plaintiffs have failed to state a claim for relief under RICO because, in

22   *Reves v. Ernst & Young*, 507 U.S. 170 (1993), the Supreme Court held that, for § 1962(c) liability to

23   obtain, the defendant must have operated or managed the enterprise's affairs, meaning that the

24   defendant must have had "some part in *directing* those affairs."  *Id.* at 179 (emphasis added); *see*

25   *also Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) (noting that "[o]ne can be 'part' of an

26   enterprise without having a role in its management and operation[;] [s]imply performing services for

27   the enterprise does not rise to the level of *direction*") (emphasis added).  As the Ninth Circuit has

28   explained:

11

United States District Court

For the Northern District of California

In *Reves*, purchasers of demand notes sued Ernst & Young, accountants employed by a farmer's cooperative.  The gravamen of the complaint was that defendants, in arriving at a valuation in a financial audit, relied upon assessments rendered by two previous accountants, both of whom were convicted of tax fraud, allegedly in violation of § 1962(c). The audits overstated the value of the cooperative, especially the fixed-asset value of a gasohol plant.  The cooperative filed for bankruptcy, and, as a result, the demand notes were frozen in the bankruptcy estate and were no longer redeemable at will by the note holders.  Subsequently, the note holders sued in a class action to recover against numerous individuals and entities, including the defendants.

The *Reves* Court upheld summary judgment entered in favor of defendants. . . . Ernst & Young's preparation of the audit reports, meeting with the Board of Directors to explain the audits, and presentations at the annual meetings, did not suffice to impute RICO liability.  Notwithstanding that the firm made a critical, wrong decision that affected the solvency of the cooperative, and did not inform the board of directors about it, the *Reves* majority concluded that even this level of decision making did not rise to the level of *directing an enterprise*.

*Baumer v. Pachl*, 8 F.3d 1341, 1343-44 (9th Cir. 1993) (emphasis added).

Since *Reves*, courts have emphasized that direction requires some degree of control, *see, e.g.*, *Dahlgren v. First Nat'l Bank*, 533 F.3d 681  689-90 (8th Cir. 2008) (noting that § 1962(c) requires that the defendant "exercise[] some degree of control over the operation or management of [the enterprise's affairs"); *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307-08 (S.D.N.Y. 2010) (stating that "it is not enough to allege that a defendant provided services that were helpful to an enterprise, without alleging facts that, if proved, would demonstrate some degree of control over the enterprise"), even if that control is not significant. *See Reves*, 507 U.S. at 179 n.4 ("disagree[ing] with the suggestion of the Court of Appeals for the District of Columbia Circuit that § 1962(c) requires '*significant control* over or within an enterprise'") (emphasis in original).  Simply providing assistance to the enterprise or having influence over the enterprise is not enough.  *See, e.g.*, *University of Md. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993) (stating that "[s]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result"); *Department of Economic Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 466 (S.D.N.Y. 1996) (noting that "[b]ribery is

qualitatively different from mere influence or assistance because the outsider paying the bribes buys actual control over the actions of a person within the enterprise").  For example:

- In *Baumer*, 8 F.3d at 1341, the plaintiffs alleged that an attorney had perpetuated a fraud conducted by two third parties – *e.g.*, by preparing two letters to a government agency and other persons and entities "designed to forestall and cover-up the fraud by minimizing or mischaracterizing the allegedly improper activities of [the third parties]" and by "knowingly fil[ing] a false partnership agreement . . . to create the false impression that [a company in which the plaintiffs had invested] was formed and operated in accordance with law."  *Id.* at 1342-43.  The Ninth Circuit rejected the plaintiffs' contention that they had alleged enough to hold the attorney liable under § 1962(c).  The court explained: "[The attorney's] role was limited to providing legal services . . . . Whether [he] rendered his services well or poorly, properly or improperly, is irrelevant to the *Reves* test.  We are therefore compelled to conclude that under the Reves 'operation or management' test the complaint fails to allege a § 1962(c) cause of action as to Pachl."  *Id.* at 1344.

- In *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340 (S.D.N.Y. 1998), *abrogated on other grounds as stated in State Farm Mut. Auto. Ins. Co. v. Cohan*, No. CV 09-2990 (JS) (WDW), 2009 U.S. Dist. LEXIS 125653 (E.D.N.Y. Dec. 30, 2009), the plaintiffs were victims of a fraudulent scheme orchestrated by an individual.  The individual made fraudulent promises to plaintiffs which induced them to invest over $100 million with him – approximately $ 82 million of which he eventually stole.  The plaintiffs filed suit against the bank where their investment funds were maintained.  According to the plaintiffs, the bank helped the individual steal their money by, *e.g.*, "failing to inform either the state banking authorities or the investors of what it knew regarding the fraud" and "misleading investors as to the status of the accounts by, among other things, submitting to investors a fraudulent report . . . overstating the balance of the escrow account in which most of the investors' funds were maintained and misrepresenting that the account restrictions were still in place."  *Id.* at 344-45.  The court concluded that the plaintiffs had failed to state a claim for relief under § 1962(c).  While "[t]here [was] no doubt that plaintiffs have alleged wrongful acts that were

13

United States District Court

For the Northern District of California

allegedly of real importance to Schick's scheme," which included "helping Schick to conceal the scheme generally[,] . . when reduced to their essentials, these are really allegations of *assistance* to the alleged RICO enterprise, not direction of it." *Id.* at 347 (emphasis in original); *see also In Industrial Bank of Latvia v. Baltic Fin. Corp.*, No. 93 Civ. 9032, 1994 U.S. Dist. LEXIS 8580, at *8 (S.D.N.Y. June 24, 1994) (dismissing RICO claim against bank and individual officers on the grounds that "providing banking services – even with knowledge of the fraud – is not enough to state a claim under § 1962(c)").

- In *Strong & Fisher Ltd. v. Maxima Leather, Inc.*, No. 91 Civ. 1779 (JSM), 1993 U.S. Dist. LEXIS 10080 (S.D.N.Y. July 22, 1993), the plaintiffs sued a creditor of the alleged RICO enterprises. The court noted: "The fact that, as a major creditor of those corporations, these defendants had substantial persuasive power to induce management to take certain actions and had the legal authority to take other actions that could affect these corporations is not equivalent to having the power to 'conduct or participate directly or indirectly in the conduct in the affairs of those corporations.'" *Id.* at *4.

In their papers, Plaintiffs contend that they have satisfied the *Reves* standard – *i.e.*, that they have adequately alleged MEPCO taking some part in directing NAWUS's affairs. However, the list of allegations provided by Plaintiffs in their opposition underscore that, at most, they have simply alleged assistance in carrying out the fraudulent scheme with knowledge of the fraud, not an exercise of a degree of control over NAWUS. *See, e.g.*, Opp'n at 7-9 (claiming that MEPCO provided the "financial grease" for the scheme, released money to NAWUS so that it would have adequate reserves to cover cancellations, and encouraged NAWUS to change its name).

At the hearing, Plaintiffs highlighted in particular ¶¶ 76 and 90 of their complaint as allegations supporting their assertion of control. But neither is availing. In ¶ 76, Plaintiffs claim that MEPCO did not permit NAWUS to file for bankruptcy earlier in time, but the actual factual allegation in ¶ 76 simply reflects that MEPCO expressed concern internally about bankruptcy. That is insufficient to show that MEPCO controlled NAWUS's decision about when to declare bankruptcy. Moreover, as noted above, even substantial influence by a party through persuasion with respect to an alleged RICO enterprise is not enough to establish control. As for ¶ 96, it does

**United States District Court**

For the Northern District of California

1   not state that MEPCO paid for NAWUS's payroll or other obligations; rather, it simply reflects that

2   MEPCO advanced fundings to NAWUS.[5]  In short, the allegations do not establish anything more

3   than MEPCO's role as funder and creditor of NAWUS.

4         Accordingly, the Court dismisses the RICO claim against MEPCO.  The dismissal shall be

5   with prejudice as Plaintiffs have not made any demonstration that they would be able to plead

6   additional factual allegations to establish the requisite level of direction or control.

7   C.    Fraud-Related Claims

8         Other than the RICO claim, Plaintiffs' fraud-related claims are the claims for violation of §§

9   17200 and 17500 and the claim for common law fraud.  In the motion to dismiss, MEPCO

10   challenges the fraud-related claims because, in essence, Plaintiffs have failed to allege that MEPCO

11   (as opposed to another defendant) made any misrepresentation to Plaintiffs and that Plaintiffs relied

12   on any such misrepresentation.  This argument is not especially persuasive.  Plaintiffs have alleged

13   that MEPCO was a key party in the fraudulent scheme.  That the fraudulent representations were

14   actually made by another defendant should not insulate MEPCO from liability, particularly because

15   its role in the fraudulent scheme has been adequately explained by Plaintiffs.  As the Ninth Circuit

16   noted in *Swartz*,

17
18         there is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify *false statements* made by each and every defendant.

19         "Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the

20         desired result."  On the other hand, Rule 9(b) does not allow a complaint to merely lump multiple defendants together but "require[s]

21         plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations

22         surrounding his alleged participation in the fraud."  In the context of a fraud suit involving multiple defendants, a plaintiff must, at a

23         minimum, "identif[y] the role of [each] defendant[] in the alleged fraudulent scheme."

24

25         [5]  To the extent Plaintiffs contend that MEPCO exerted control over the Atkinson brothers,

26   *see* Opp'n at 8-9; SAC ¶¶ 72-73, the Atkinson brothers are not the RICO enterprise – rather, NAWUS is.  Moreover, even if the Atkinson brothers should, in effect, be considered NAWUS,

27   Plaintiffs have still made insufficient allegations of control.  Plaintiffs have simply alleged that, after the Atkinson brothers' new VSC venture failed (where they were the administrators of the VSCs

28   instead of Choice), MEPCO arranged for the VSCs that had been sold to be transferred to a new administrator.  *See* SAC ¶ 73.

United States District Court

For the Northern District of California

1    *Swartz*, 476 F.3d at 764-65.

2          While MEPCO's argument above is not persuasive, there is a bigger problem with Plaintiffs'

3    fraud-related claims against MEPCO.  That is, Plaintiffs taken the position that MEPCO was an

4    active part of the fraudulent scheme because it knew that the VSC sales were deceptive (*i.e.*, that

5    there was never an intent to pay for the cost of vehicle repairs) but kept on doing business with

6    NAWUS and Choice.[6]  According to Plaintiffs, MEPCO knew or should have known that the VSC

7    sales were deceptive because it knew, *e.g.*, that (1) multiple state attorney general lawsuits or

8    investigations had been launched against NAWUS; (2) numerous consumer complaints had been

9    made against NAWUS; (3) there were high cancellation rates for the VSCs; and (4) NAWUS did not

10   have adequate reserves to pay for cancellations (such that, *e.g.*, it had to ask for mid-week fundings

11   from MEPCO multiple times).  *See, e.g.*, SAC ¶¶ 83-84, 90, 99, 166.  But none of the above

12   allegations makes a plausible case that MEPCO knew the VSC sales were deceptive.  For example,

13   the complaint does not clearly explain what the state attorney general lawsuits or investigations were

14   about.  Plaintiffs allege that deceptive marketing was at issue, *see* SAC ¶ 166, but that could simply

15   be, *e.g.*, illegal telemarketing through the use of robo-calls.  If so, that would not put MEPCO on

16   notice that there was never an intent to pay for the cost of vehicle repairs.  Similarly, even if

17   MEPCO knew about a high number of customer complaints and cancellations and problems with

18   adequate reserves, that cannot be equated with knowledge that there was never an intent to pay for

19   the cost of any repairs, at least in the absence of additional evidence.  Likewise, NAWUS's lack of

20   funding does not imply that the VSC sales were fraudulent and that MEPCO knew it.  While

21   Plaintiffs have arguably pleaded facts that are consistent with knowledge, the Supreme Court has

22   emphasized that, "[w]here a complaint pleads facts that are merely consistent with a defendant's

---

[6] For a claim of aiding and abetting common law fraud – "[l]iability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person . . knows the other's conduct constitutes a breach of a duty and gives substantial assistance or encouragement to the other to so act."  *Casey v. U.S. Bank National Ass'n*, 127 Cal. App. 4th 1138, 1144 (2005).  For conspiracy to defraud – a plaintiff must allege all the elements of actionable fraud as well as a civil conspiracy, which include "(1) the formation and operation of the conspiracy and (2) damage resulting to the plaintiff (3) from a wrongful act done in furtherance of the common design."  *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1062 (2006).

**United States District Court**
For the Northern District of California

1    liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*,

2    129 S. Ct. at 1949.

3         To the extent Plaintiffs try to save their fraud-related claims by arguing that there is a

4    misrepresentation in the PPA (*i.e.*, that MEPCO has the legal right to collect from a consumer), *see*

5    SAC ¶ 63; Opp'n at 2, 22), Plaintiffs have failed to show that the statements in the PPA are

6    attributable to MEPCO given that the PPA is, on its face, an agreement between Choice and the

7    consumer.  *See also* Part IV.C, *infra* (discussing contract-related claims).

8         Finally, the Court takes into account that, with respect to the CLRA claim, there is one

9    additional argument that MEPCO makes.  *See* Mot. at 16 n.5.  The CLRA proscribes certain "unfair

10   methods of competition and unfair or deceptive acts or practices undertaken by any person in a

11   transaction intended to result or which results in the sale or lease of goods or services to any

12   consumer."  Cal. Civ. Code § 1770(a).  According to MEPCO, to the extent Plaintiffs claim that the

13   sale of the VSCs constitutes the sale of a service, *see* SAC ¶ 209, that is contrary to *Fairbanks v.*

14   *Superior Court*, 46 Cal. 4th 56 (2009), as Judge Conti recently held in a case in which Choice is also

15   a defendant.  *See Sanders v. Choice Mfg. Co., Inc.*, No. C-11-3725 SC (Docket No. 40) (Order at 11-

16   13).  In *Fairbanks*, the issue before the California Supreme Court was "whether life insurance is a

17   'service' subject to the [CLRA's] remedial provisions."  *Fairbanks*, 46 Cal. 4th at 59.  The Court

18   determined that it is not because "[a]n insurer's contractual obligation to pay money under a life

19   insurance policy is not work or labor, nor is it related to the sale or repair of any tangible chattel."

20   *Id.* at 61; *see also* Cal. Civ. Code § 1761(b) (defining services as "work, labor, and services for other

21   than a commercial or business use, including services furnished in connection with the sale or repair

22   of goods").  Here, the VSCs are akin to insurance contracts, being, in essence, promises to pay

23   money.  Therefore, the Court concludes that the CLRA is not a viable claim that can be asserted by

24   Plaintiffs.  To the extent Plaintiffs suggest that *Fairbanks* should be limited in application to

25   insurance contracts alone, that argument is not persuasive.  In fact, in *Sonoda v. Amerisave Mortg.*

26   *Corp.*, No. C-11-1803 EMC, 2011 U.S. Dist. LEXIS 73940 (N.D. Cal. July 8, 2011), this Court held

27   that, consistent with *Fairbanks*, a loan should not be considered a service either.  *See id.* at *5

28   (stating that, "[i]f a contractual obligation to *pay* money (under an insurance contract) is not a

United States District Court

For the Northern District of California

1    service, then neither is a contractual obligation to *lend* money[;] [a] contractual obligation to lend

2    money is neither work nor labor, nor is it related to the sale or repair of any tangible chattel").

3          To the extent Plaintiffs argue that the transactions at issue here also involved the sale of a

4    good – *i.e.*, an engine or other vehicle additive product, *see* SAC ¶ 209 – it is not clear from the

5    complaint that the engine additive product was the item actually being sold.  Rather, the complaint

6    as it reads seems to suggest that what was being sold was the VSC and that the engine additive

7    product was simply something that had to be installed in order for the VSC protections to kick in.

8    *See* SAC ¶ 9.

9          Accordingly, the Court concludes that all of the non-RICO fraud-related claims should be

10   dismissed because there are insufficient allegations that MEPCO knew that the VSCs were

11   deceptive.  In addition, the Court dismisses the CLRA claim on an independent ground – *i.e.*,

12   because a VSC is not a service and the engine additive product was not the item being sold (at least

13   not as alleged in the complaint).  Plaintiffs have leave to amend their complaint to address these

14   deficiencies in the non-RICO fraud-related claims.  The Court emphasizes that this is the second

15   time the Court is giving Plaintiffs an opportunity to address a deficiency with respect to the element

16   of knowledge.  Any future deficiency may result in a dismissal of the fraud-related claims with

17   prejudice.

18   D.    Contract-Related Claims

19         The contract-related claims asserted against MEPCO are claims for breach of contract and

20   breach of the implied covenant of good faith and fair dealing.  Previously, the Court dismissed the

21   contract-related claims brought by Plaintiffs because they failed to allege that there was a

22   contractual relationship between themselves and MEPCO.  In their SAC, Plaintiffs claim that there

23   is a contractual relationship because of the PPA.  However, as noted above, the PPA on its face

24   states that it is an agreement between the consumer and Choice (the administrator).  MEPCO is

25   identified in the PPA as the payment plan servicer only.  *See* SAC, Ex. B (PPA).

26         Plaintiffs try to overcome this problem by arguing that MEPCO really is a party to the PPA

27   because MEPCO sent out to Plaintiffs a "Notice of Conditional Acceptance."  *See, e.g.*, SAC, Ex. B

28   (notice).  But this is consistent with MEPCO simply acting as Choice's agent; it does not necessarily

United States District Court

For the Northern District of California

1    transform MEPCO into one of the contracting parties.  Moreover, the Notice of Conditional

2    Acceptance is clearly targeted at the VSC, which Plaintiffs admit is a contract between the consumer

3    and Choice alone.  *See* SAC ¶ 35 (alleging that "the VSC was an agreement between the

4    Administrator and the consumer").  The notice is actually titled "Notice of Conditional Acceptance,

5    Subject to Verification by Administrator" and, at the bottom of the notice, the following statements

6    are made:

7            Once the Administrator approves and accepts the Warranty or Service
             Contract listed above, you will have coverage in accordance with the
8            terms of the Warranty or Service Contract and will become obligated
             under your Payment Plan Agreement to make payment.  Refer to your
9            Payment Plan Agreement for applicable terms and conditions.

10   SAC, Ex. B (notice).

11           Finally, MEPCO makes a fair argument that, even if it were considered a party to the PPA, it

12   is not clear what provision of the PPA was breached or how the implied covenant in the PPA was

13   breached by MEPCO.  To the extent Plaintiffs claim a breach of the VSC because covered repairs

14   were not paid for, *see* SAC ¶ 225 (alleging a breach of the VSC by Choice on this ground), it is not

15   clear how that breach can be attributed to MEPCO when it was not a contracting party to the VSC.

16           Accordingly, the Court grants the motion to dismiss the two contract-related claims.  The

17   dismissal of these claims is with prejudice.

18   E.      Unjust Enrichment

19           Finally, MEPCO argues for dismissal of the remaining claim for unjust enrichment on the

20   basis that such a claim is precluded given that Plaintiffs have chosen to sue in tort.  *See* Mot. at 22.

21   The Court rejects this argument.  In support of its argument, MEPCO relies on *Rosal v. First*

22   *Federal Bank of California*, 671 F. Supp. 2d 1111 (N.D. Cal. 2009) (Hamilton, J.).  There, the court

23   stated:

24           Unjust enrichment is typically sought in connection with a
             "quasi-contractual" claim in order to avoid unjustly conferring a
25           benefit upon a defendant where there is no valid contract.  Under an
             unjust enrichment theory, restitution may be awarded either (1) in lieu
26           of breach of contract damages, where an asserted contract is found to
             be unenforceable or ineffective, or (2) where the defendant obtained a
27           benefit from the plaintiff by fraud, duress, conversion, or similar
             conduct, but the plaintiff has chosen not to sue in tort.  Thus, a claim

28

19

United States District Court
For the Northern District of California

for restitution is inconsistent and incompatible with a related claim for breach of contract or a claim in tort.

*Id.* at 1133. But, as this Court pointed out in *Clear Channel Outdoor, Inc. v. Bently Holdings Cal. LP*, No. C-11-2573, 2011 WL 6099394 (N.D. Cal. Dec. 7, 2011), "even though a plaintiff may not ultimately prevail under both unjust enrichment and breach of contract [or tort], it may plead both in the alternative." *Id.* at *9. Plaintiffs affirm in their opposition brief that their unjust enrichment claim is pled in the alternative. *See* Opp'n at 23.

Of course, the bigger problem for Plaintiffs is that their unjust enrichment claim is ultimately predicated on MEPCO's knowledge of and participation in the fraudulent scheme and, as discussed above, Plaintiffs have not alleged enough to establish that MEPCO knew or should have known that the VSC sales were deceptive (*i.e.*, that there was never an intent to pay for the covered repairs). The Court therefore dismisses the unjust enrichment claim without prejudice. Plaintiffs have leave to amend consistent with the above.

F.    Summary

The claims against IBC and MEPCO are dismissed in their entirety. The dismissal of the RICO claim and the contract-related claims is with prejudice. Plaintiffs have leave to amend the non-RICO fraud-related claims as well as the claim for unjust enrichment.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants both Mr. Masi's motion to dismiss and MEPCO/IBC's motion to dismiss. The dismissal of Mr. Masi is without prejudice. As for MEPCO and IBC, the only claims dismissed with prejudice are the RICO claim and the contract-related claims. Plaintiffs have leave to amend the non-RICO fraud-related claims against MEPCO and IBC. In the amended pleading, Plaintiffs must address each of the deficiencies identified by the Court above. Any amendment must be filed within 30 days.

///

///

///

///

A case management conference is set for August 10, 2012, at 9:00 a.m.  A joint case management conference statement shall be filed one week prior to the conference.

This order disposes of Docket Nos. 65 and 67.

IT IS SO ORDERED.

Dated:  July 24, 2012

_____
EDWARD M. CHEN
United States District Judge

**United States District Court**
For the Northern District of California